UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 3:18CR90 (JAM) |
| v. | : | |
| | : | |
| WILSON VELEZ, a.k.a. "Wiso" | : | June 25, 2020 |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The Government respectfully submits this Sentencing Memorandum with regard to defendant Wilson Velez, a.k.a. "Wiso," (the "defendant" or "Velez") who is scheduled to be sentenced on July 8, 2020.

## I.   INTRODUCTION AND BACKGROUND

Wilson Velez devotes a substantial portion of his sentencing memorandum describing a childhood of abandonment and abuse that contributed to his devotion to a different family: the Almighty Latin King Nation.   At 18, Velez explained, he was on his own, with no family, no job, no skills, and no prospects.   *See* Def. Mem., at 5.   He, or rather the "streets[,] raised [him]."   *Id*. Leading to the assertion, "it is no wonder he is where he is now."   *Id*.   The inference to be drawn is that by the time Velez was 18, his path was pre-determined and that he had no choice but to immerse himself into the Latin King culture.   Any such inference must be emphatically rejected.

Velez is no longer 18, alone, with no family, skills, or prospects.   Quite the contrary, in the Summary and Fall of 2017, Wilson Velez was married, with three children, living together in a single-family home in Newington, and operating a clothing store in Hartford.   *See* PSR ¶¶ 89 and 100.   The government's investigation also revealed that Velez owned and operated a construction business, J&W Fixtures LLC, which was incorporated in July 2017.   *See*

1

https://www.concord-sots.ct.gov/CONCORD/online?sn=PublicInquiry&eid=9740.   The Velez family income was supplemented by an annuity Jennie Velez received as part of a personal injury settlement.   *Id.* ¶ 92.   Velez also enjoyed a strong relationship with his wife (*see* PSR ¶ 90) and had a great relationship with his children.   *See id.* ¶ 98.   From this perspective, Velez had everything he lacked when he was 18.   In fact, he had what the majority of most Americans would describe as success.   A strong family, a family owned business, and a safe and secure place to live.   But that was not enough for Velez.   Because Velez has always defined himself more as a gangster and the leader of the Latin Kings, than as a family man.   He achieved the rank of a Regional Officer (RO) for Connecticut, the second highest-ranking Latin King in the State, *not* because his path was predetermined from a childhood of abuse of neglect and abuse, but because he strove for this.   He wanted to be a Latin King.   He wanted to be a leader of the Latin Kings. Wilson Velez stands before this Court facing a recommended sentencing range of 360 months to life not because the "streets" raised him, but because of a life spent relishing the role of an outlaw.

If there was any doubt as to Velez's motivations (and dangerousness), the Court need not look any further than whom Velez ensnared in his criminal enterprise.   First, Velez used and employed his 18-year old nephew and a 17-year juvenile to process, package, and deliver dangerous drugs such as fentanyl.   Employing family members and juveniles in his drug enterprise provided substantial benefits to Velez.   Family members, if arrested, would be less likely to cooperate.   Juveniles, if arrested, are far less likely to be imprisoned thereby substantially reducing any leverage law enforcement may have to persuade the juvenile to cooperate.   Second, Velez employed his foster father, the "sexual predator" who abused Velez's half-brother (*see* Def. Mem. at 1-2), to secure and maintain the epi-center of Velez's drug operation at 8-10 Hamilton

Street.   And knowing that his foster father was a convicted sex offender, Velez also knew that his 17-year old employee shared a bed with Velez's foster father.   Third, Velez also used the Newington residence, which he shared with his wife and children, to package and distribute deadly fentanyl.   Despite Velez's proclamation that he "would never want my kids to know that lifestyle," he brought it right to their doorstep.   *See* PSR ¶ 90.

Velez's story does not begin or end with his drug enterprise.   His interconnected criminal and gang activity were publically encapsulated in the April 28, 2017 Franklin Avenue shooting. That one event showed clearly Velez's power and influence within the Latin Kings, the inextricable connection between the gang and their control over the drug distribution in certain neighborhoods, and Velez's resolve to enforce the gang's presence and promote his leadership. As the Court is well aware, Velez orchestrated the confrontation, supplied the gun to Joshua Amaral, drove his clique of Kings to Franklin Avenue, stood at the forefront of the confrontation, and demanded the drug dealer to leave the area.   As the security cameras plainly show, there was no question as to who was in charge.   And when the assault turned into a gunfight, it was Velez who pointed to Victim #2 so that Claudio could direct fire and shoot Victim #2.

Velez purports to have renounced his allegiance to and membership in the Latin Kings. *See* PSR ¶ 74.   He previously renounced his association with the Latin Kings while in DOC custody, but returned to the gang with renewed determination.   *See id*.   Velez asserts that his "past is my past," but there is no reason to believe that his past will not also be his future.   Velez had everything he needed to make the Latin Kings a part of his past in 2017.   He had a supporting family, two growing businesses, and a safe and secure residence away from the neighborhoods and the City that first exposed him to gang life.   If that did not persuade Velez to change his path,

3

then there is no reason to think anything will be different going forward.

Velez has emphatically demonstrated that he is a danger to the community.   Drugs, guns, gangs, and violence are as much a part of Velez's DNA as any other genetic code.   Even when given a chance on bond following the December 2017 arrest, he resumed criminal activity and tipped off other gang members to the FBI investigation.   Despite all that happened, and the probability of serving a lengthy federal prison sentence, Velez chose the Latin Kings.   This Court should not be duped by Velez's most recent efforts to renounce the Latin Kings or his hollow promises of change.   Velez did everything he could to justify where he is now and the long prison sentence he has earned and what is necessary to ensure the safety of the community and to promote just punishment.

## II.   FACTS AND CIRCUMSTANCES OF DEFENDANT'S CONDUCT

### The April 28, 2017 Franklin Avenue Shooting

At approximately 11:00 a.m., Velez, Miguel Claudio, a.k.a. "Mega," and three other members of the Almighty Latin King Nation ("ALKN" or "Latin Kings"), confronted a man (hereafter "Victim A") who was selling drugs at the corner of Franklin Avenue and Barker Street. Earlier that morning, Victim A was warned by two unidentified men that he should not be selling drugs at that location.   Victim did not heed their warning.   With Velez at the lead, Claudio, Amaral, Angel Cabrera, and an unindicted co-conspirator, approached and surrounded Victim A. Amaral was armed with a firearm.   Velez told Victim A that he could not sell drugs in this location without Latin King authorization.   Victim A was again defiant.   Claudio then searched Victim A.   There is some evidence that Victim A had a gun, and Claudio took it from him. Regardless, it is undisputed that Claudio was from that point forward armed with a firearm.

Immediately after Victim A was searched, Cabrera punched Victim A in the head, and continued to strike him while the others joined in the assault.   Victim A attempted to escape the assault, with the five assailants in pursuit.   Victim A ran towards his friend, Victim B, who was also armed with a firearm.   Within seconds gunfire erupted.   Amaral was shot in the leg, causing him to run for cover across the street.   Amaral is carrying the gun as he ran for cover.   Cabrera took cover with Amaral, behind a parked car.   Cabrera took Amaral's gun, ran and discarded the gun behind a nearby building.   Meanwhile, Miguel Martinez, a.k.a. "Nitro," drove up, dragged Amaral into his car, and brought him to the hospital.

Across the street, Claudio and Victim B engaged in a gun battle.   Victim A is struck in the foot by a gunshot from Claudio and ran down Franklin Avenue.   Velez saw Victim B on the alley side of the bodega and pointed him out to Claudio.   Claudio, using the bodega as cover, continued to shoot at Victim B, striking him in the leg. Victim B then ran down the alley behind the bodega.   Velez then retreated to his car and fled the scene.   Claudio, still brandishing his gun, ran down Barker Street toward the rear of the bodega where he re-engaged Victim B in a gun battle.   Claudio is shot during this exchange.   The gunshots were heard by a passing patrol officer who immediately responded to that location.   As the officer approached 265 Franklin Avenue, he observed Claudio holding and firing a revolver.   Claudio ran upon seeing the officer and a foot pursuit ensued.   Claudio was apprehended a short distance away, in the rear of 93 Bond Street, suffering from multiple gunshot wounds.   Claudio was transported by ambulance to Hartford Hospital.   Victim A and Victim B sustained gunshot wounds to their lower extremities. Both were treated at the hospital and released.

Three firearms were recovered.   Victim B's .380 Hi-Point was recovered from his girlfriend's residence, where he awaited the arrival of police.   Four casings recovered from the scene were determined to have been fired from Victim B's gun.   A Bersa .380 caliber was recovered in the rear parking lot of 241 Franklin Avenue.   That firearm had five live rounds in the magazine.   No shell casings were recovered that matched that firearm.   This is the location where Cabrera was seen running after taking the gun from Amaral.   The third firearm was a Smith & Wesson .357 revolver, which was recovered in the rear of 241 Franklin, in close proximity to where Claudio was apprehended.   The revolver had six spent casings inside the cylinder.

### The Narcotics Conspiracy

Beginning in June 2017, an FBI confidential human source (CHS) began purchasing heroin and fentanyl from Velez and his associates.   Velez proved to be a shrewd drug trafficker, employing family members and vulnerable persons susceptible to his persona and influence.   For example, he used his 18-year nephew to bag up heroin/fentanyl and a 17-year old to deliver drugs to customers.   He placed other Latin King members into the apartment building where he stashed his drugs as an additional buffer to detection by law enforcement.

Velez lived in Newington with his family and he occasionally used that location to distribute heroin/fentanyl, but he mostly used 8-10 Hamilton Street as his stash and distribution location.   Franklyn Nieves lived on the first floor of 10 Hamilton Street and managed the property for his brother, the owner.   Another location where Velez and the ALKN were known to distribute narcotics was in the area of 22 Elliott Street in Hartford.   Velez and his wife owned and operated a store at 351 Wethersfield Avenue, which is located near the intersection of Elliott Street and Wethersfield Avenue.   Twenty-Two Elliot Street is a large apartment building known as an area

6

with frequent and regular street level narcotics activity.    The investigation first focused on known ALKN members who were distributing drugs at that location.    Beginning in May 2017, the FBI Task Force began using confidential sources to purchase drugs and/or guns from targeted drug dealers.

For example, on May 19, 2017, an FBI confidential source was tasked with purchasing an ounce of crack cocaine and a quantity of heroin from Mario Mercado, a.k.a. "Taz." Mercado told the CHS that the "crack" was not ready as he had to "cook," or convert, it from powder to crack, but that he had a stack and a half (150 bags) of heroin ready to go.    Investigators directed the CHS to proceed with the heroin purchase.    During the meeting, Mercado told the CHS to be careful with the "heroin" as someone had passed out using it.    The CHS asked if there was fentanyl in it and Mercado responded that he did not know.    According to the DEA lab, the substance contained heroin and U-47700, a.k.a. "Pink," another dangerous synthetic opioid that was added to Schedule I by the DEA in 2016.

On June 8, 2017, the CHS was tasked to purchase a firearm from Miguel Martinez, a.k.a. "Nitro."    The CHS purchased a Taurus 9 mm pistol, with ten rounds of ammunition from Martinez in the area of Warner Street Extension.    During the exchange, Martinez stated that the gun belonged to "Mario" (Mercado) and that "Mario" was helping him out after Martinez's recent drug arrest.    Martinez and Mercado are cousins.    Martinez also stated that they had just pistol-whipped someone with the gun so it might have blood on it.    While there was no observable blood on the gun, it was sent to the lab for further testing.    Martinez was a previously convicted felon having been convicted in Connecticut Superior of Court of escape 1st degree, in 2008, and larceny 3rd  degree, in 2004 (two counts).

On June 23, 2017, the CHS contacted Martinez to purchase crack cocaine.    When the CHS had difficulty contacting Martinez, the CHS called Mercado and asked him to call Martinez.    Mercado called the CHS and said Martinez would be contacting the CHS shortly.    Martinez called CHS soon thereafter.    Martinez agreed to sell the CHS two stacks and heroin and met at 39 Shultas Place, where they met during the May 19, 2017 buy.    During the transaction, Martinez told the CHS that the heroin was "Wiso's shit" [Velez] and that there was fentanyl in it.    The DEA Lab confirmed it contained heroin and fentanyl.

Meanwhile, in June 2017, another FBI CHS began purchasing heroin and fentanyl directly from Velez.    As noted above, Velez would sometimes use the 17-year old juvenile and Velez's nephew to prepare and deliver drugs.    Over the next two months, between June 14 and August 18, 2017, the CHS purchased heroin mixed with fentanyl, or fentanyl, from Velez on six occasions. On August 18, 2017, the FBI obtained authorization to intercept wire and electronic communications over a wireless telephone being used by Velez.    Intercepted communications revealed that this telephone (Target Telephone 1) was used by Velez principally to discuss Latin King business.    Intercepted communications also revealed that Velez had a second phone.    On September 12, 2017, the FBI received authorization to intercept wire and electronic communications on Velez's second phone (Target Telephone 2), as well as a renewal to continue monitoring Target Telephone 1.    Target Telephone 2 proved to be Velez's primary drug phone.

Intercepted communications revealed that Velez had multiple customers and associates participating in his narcotics conspiracy. Sammy Diaz, the purported leader of the Latin Kings in Meriden, was a customer of Velez.    Diaz was intercepted on Velez's drug phone on multiple occasions.    For example, on September 14, 2017, intercepted communications indicated that Diaz

8

wanted to a combination of "deadly and the regular shit" "fifty-fifty."   Velez agreed and they met on Elliott Street.   After they met, investigators stopped Diaz thinking that he picked up a quantity of heroin and fentanyl.   Diaz had nothing in his possession, but after the stop he called Velez to tell him he had been stopped by the police.   Velez stated that it's "hot" on Elliott Street and he would not have Diaz pick up on Elliott Street.   Two days later Velez told Diaz that he "got fire," the "shit is hot" and its "official he charged 70."   Velez told Diaz he would leave it in the car at his Newington residence.   Later that day, Diaz told Velez that he "got it." During one of the controlled buys by CHS, Velez told CHS that he sold fentanyl for $70 per gram.

Cruz Fernandez, a.k.a. "Blood," was another of Velez's customers.   Fernandez was not a Latin King.   In fact, he was a Blood from New York City, who moved to Springfield, before arriving in Hartford.   Fernandez was a regular seller of heroin/fentanyl and crack cocaine on Elliott Street.   He also lived in one of the apartments at 22 Elliott Street.   For example, on September 16, 2017, Velez directed Fernandez to bring him "five whole ones" or five "stacks" (500 bags) of heroin/fentanyl.

On or about September 19, 2017, Velez was alerted by his cousin, Angel Velez, that federal law enforcement may be onto their criminal activities and to drop his phone.   In an effort to determine if Velez had acquired a new phone, FBI tasked the CHS to make a drug buy from Velez. During the operation, Velez directed the CHS to come to 22 Elliott Street.   When they met in front of 22 Elliott Street, Velez told the CHS not to go to his house or contact him on his phone, and that Velez would provide the CHS with a new phone number soon.   Velez then motioned for Fernandez to go into 22 Elliott Street.   When Fernandez came out of the building, he handed 200 bags of heroin to Velez who then handed them to the CHS.

On October 16, 2017, during another controlled buy by CHS, Velez told the CHS that he was mixing 20 grams of heroin with 20 grams of fentanyl, but not to tell "Blood" (Fernandez) because Velez had only given "Blood" five "boxes" of it.    A box is 500 bags of heroin/fentanyl.

Fernandez and Velez were also involved in violence.   On September 14 and 15, 2017, intercepted communications revealed that Fernandez was intending to harm Amaral.   According to intercepted communications, Amaral purportedly fired a gun at an associate of Fernandez (identified in intercepted communications as "Fox") near 22 Elliot Street, on September 14, 2017. Hartford Police Department's ShotSpotter System detected one gunshot at approximately 11:04 p.m.    After the shooting incident, Fernandez complained to Velez about "Ill" (Amaral). Fernandez told Velez that, "I'm done with this nigga, we taking care of this nigga rat problems." Fernandez also warned Velez, "so tell Capone [who investigators know to be Randy Cortes, the State Regional Officer of the Latin Kings for the State of Connecticut and to whom Velez reported] if he with him that car with him . . . We about to flare it the fuck up next time he pull up" and that he would be "banging on him."   Velez responded to Fernandez, "bang on him."   Several minutes later, Velez called Cortes and asked if was with Amaral earlier that night and to "stay away from him."   Meanwhile, Hartford Police and members of the FBI Task Force immediately responded to the Elliot Street area and remained there for several hours looking for Amaral.   To prevent further violence, the next day, on September 15, 2017, members of the Task Force obtained an arrest warrant for Amaral based on controlled drug purchases made by a confidential source.   That night, Amaral was located and taken into custody.

Amaral, as noted above, sold drugs to a confidential source. More particularly, on July 26, 2017, a confidential source purchased 50 bags of fentanyl from Amaral and on July 31, 2017, the

source purchased another 100 bags of fentanyl and approximately two grams of crack cocaine from Amaral.

Frankie Vega, a.k.a. "Lips," was another customer of Velez, and member of the ALKN. Vega was first identified as a drug distributor who was operating a trap house at 951 Broad Street, Hartford.   On May 2 and 3, 2017, a FBI confidential source purchased heroin and fentanyl (for a total of 690 bags) from VEGA.   On May 3, 2017, the FBI and Hartford Police executed a search warrant at 951 Broad Street, Hartford.   Vega was arrested, along with several other individuals, but was released on bond.   On November 24, 2017, Vega was intercepted on Velez's phone coordinating the purchase of a "box" or 500 bags of heroin.

Miguel Claudio was Velez's most trusted associate and principal enforcer in the ALKN. Claudio also advanced Velez's drug enterprise.   Following a violent gun battle on April 28, 2017, Claudio nearly died.   After being in coma for months, Claudio made an unexpected recovery.   In late August 2017, Claudio was released from the hospital.   When Claudio was discharged from the hospital, he returned to his residence which he shared with his girlfriend at 1008 Capitol Avenue, Hartford.   On September 14, 2017, Hartford Police and FBI prepared to arrest Claudio on the outstanding warrant for the April 28 shooting.   Meanwhile, Hartford Police had obtained a search warrant for Claudio's residence based on reliable information that Claudio was storing firearms in the apartment.   At approximately 8:10 p.m., Hartford Police executed the search warrant at Claudio's residence.   Claudio and his girlfriend, Ada Marrero, among others, were present.   Claudio was taken into custody on the outstanding warrant.   The search revealed the following.   Inside a dresser in the bedroom shared by Claudio and Marrero, investigators recovered multiple packages containing over 100 grams of suspected crack cocaine, $80 in

currency, a digital scale with white residue, a bag with beige powder substance, and a box with empty wax sleeves.   The beige powder tested positive for heroin, and the white powder tested positive for cocaine.   In the same room, but different dresser, investigators located five .22 caliber rounds and a .32 caliber round, which were located in a purse.   In the same bedroom closet, investigators recovered a Latin King "Manifesto."   In a shoebox, on the closet floor, investigators recovered more packaging and drug paraphernalia.   In a kitchen pantry, on the top shelf, was a shoe box, inside of which was a .32 revolver, loaded with four rounds of ammunition.

Marrero claimed that the gun and the drugs belonged only to her.   She was arrested and taken into custody.   Notwithstanding Marrero's claims of sole ownership, the intercepted phone calls on the Velez's phone told a different story.   Less than ten minutes after Hartford Police made entry, Velez called his bondsmen (herein "MM") and told him, "Remember my guy Claudio?" MM: "Yeah, ah . . . Miguel Claudio. Yeah." Velez: "Yeah, um, they just hit his house." MM: "Oh, shit! (VO) Where, where?" Velez: "I don't know they called me (UI). MM: "When, How long ago did they hit it?" Velez: "Like ten minutes ago." MM: "Oh, shit... You think anything in there? Or No." Velez: "Yeah, I'm pretty sure."

Not long after that call, Velez called Randy Cortes, a.k.a. "Capone."   Velez told Cortes that the police "hit Meg's shit."   Cortes asked, "Was he clean, I mean somewhat clean?" Velez responded, "Ugghh, I want to say. Well he was trapping I don't know if they went in there to serve him with his warrant or some shit like that." The next morning, Velez called Angel Velez. Wilson Velez: "That hit me hard yesterday." Angel Velez: "Who?" Wilson Velez: "D's [detectives] and the Feds." Angel Velez: "Where?" Wilson Velez: "They hit Meg." Angel Velez: "In the back?" Wilson Velez: "Yeah." Angel Velez: "What they say?" Wilson Velez: "They caught him with that

shit." Angel Velez: "With what shit?" Wilson Velez: "You know." Angel Velez: "With the, with one of them things?" Wilson Velez: "For what you were asking me." Angel Velez: "No?" Wilson Velez: "And a BANGER." Angel Velez: "So who went down for that shit?" Wilson Velez: "His girl took the weight for everything. They put his bond 1.1 million but, they only charged him for the shooting when where he got shot."

Velez spent the next several days working with the bondsmen and collecting money to post Claudio's bond, and within a week Claudio was released.   After his release, Claudio and Marrera moved to 8-10 Hamilton Street, the six-unit apartment building where Velez stored, processed and packaged narcotics.

This defendant, Jose Rodriguez, a.k.a. "Juice," distributed crack and powder cocaine he acquired from Velez.   For example, on September 15, 2017, Rodriguez was intercepted on multiple calls with Velez.   During these calls, Rodriguez confirmed that he owed Velez for "three onions of hard" (three ounces of crack cocaine) and "half of the powder" (1/2 ounce of powder cocaine), but that Rodriguez was in hospital after been shot during a drug robbery, and as a result could not get to his "bread."   Velez convinced Rodriguez to give it to his girlfriend and Velez would collect it from her.   Subsequent calls indicated that the girlfriend could return the drugs to Velez, but that Velez did not want the drugs as he needed the money.

On December 7, 2017, Velez, Nieves, Velez's 18-year old nephew were arrested, and Nieves' apartment, as well as the basement, were searched.   In the basement, investigators recovered approximately 146 (DEA confirmed it to be 143 grams of heroin), and the knotted piece of plastic with white powder weighed 29 grams (DEA confirmed it to be 28.6 grams of fentanyl), along with copious amounts of processing and packaging materials.

In a cabinet in the basement, investigators located three .45 caliber rounds.   On a plastic table, investigators located another scale, residue, and wax paper sleeves.   On the floor, investigators located a bag.   Inside the bag were documents in the name of Velez's wife, mail addressed to Velez's Newington residence, Latin King documents to include a manifesto and disciplinary actions taken against members, Hartford Chapter [of the Latin Kings] monthly report sheets, and a notebook with phone numbers and Latin King notes.   Additional drug paraphernalia was located in back pack found under a work bench.   Inside the back pack was assorted packaging and paraphernalia to include: ink stamps, empty wax sleeves, sifters, plastic bags, digital scales, cutting agent, measuring spoons, rubber bands, empty pill capsules and a GPS.

In a cooler under the stairs, more paraphernalia was located to include cut, as well as 43 bags of suspected heroin.   DEA lab later confirmed that the substance contained heroin, fentanyl, and methamphetamine.

Velez was arrested and a week later released on bond.   He immediately resumed criminal activity.

 On January 10, 2018, Hartford Police Department detectives obtained a search and seizure warrant for a location in Hartford.   The target of that location (herein CS-1) was stopped in his vehicle after he was seen leaving his residence.   CS-1 was advised of his *Miranda* rights and told that Officers had a search warrant for his residence.   CS-1 responded, "damn … I'm hit … I'm hit."   CS-1 was advised again of his *Miranda* rights and he agreed to speak with investigators. CS-1 acknowledged that he had a "lot of stuff" in the apartment, including a .40 caliber firearm. CS-1 agreed to return to the residence while the search was conducted.

Inside the residence was another person who is described as another confidential source

(CS-2).   CS-1 was again advised of his *Miranda* rights, and he again agreed to speak with investigators.   CS-1 stated he wanted to give them all "the stuff" he had in the apartment.   When asked how much "stuff" he had, CS-1 responded "about a brick and a half."   CS-1 stated that there was about 900 grams of heroin and 400 grams of the "other stuff."   When asked what the "other stuff" was, CS-1 responded "fentanyl."   CS-1 told investigators that the drugs and gun were in safe in his bedroom.   CS-1 provided the security code and the safe was opened.   Inside, investigators recovered fentanyl, heroin and the Taurus .40 caliber pistol.

CS-1 told investigators he wanted to cooperate and could provide information on the source of the drugs and gun, as well as the location of seven additional firearms.   CS-1 told investigators that all the heroin and most of the fentanyl recovered came from Wilson VELEZ, a.k.a. "Wiso." According to CS-1, after VELEZ was released on bond on his federal case, he contacted CS-1 and delivered the drugs and guns to CS-1 to sell them.   CS-1 kept one of the guns, the Taurus .40 caliber, but brought the other seven guns to a friend who lived in Manchester.   CS-1 showed the text messages with VELEZ and explained how he brought the guns to Manchester.   CS-1 agreed to assist investigators in recovering the guns.

Under the supervision of investigators, CS-1 called his friend and told him that he was coming to get those "things" and to have them ready.   Investigators then proceeded to the Manchester residence where they made contact with the owner of the property.   CS-1's friend was also present and ordered to come downstairs to meet with the investigators.   Investigators obtained consent from the girlfriend and recovered the seven firearms.

CS-1's information implicating Velez has been corroborated in multiple ways.   First, CS-2 independently told investigators that the heroin, fentanyl, and guns belonged to Velez and that

the firearms were stored in Manchester.   Second, the latent print examination of the firearms revealed the presence of one latent print from one of the long guns.   That print belonged to a person identified herein as Witness #1.   Witness #1 is not CS-1 or CS-1.   In February 2018, Witness #1 was interviewed by investigators.   Witness #1 has no known connection to or relationship with CS-1 or CS-2.   Witness #1 was incarcerated at the time of the interview and was incarcerated at the time of Velez's arrest and when the guns were purportedly delivered to CS-1.   Witness #1 was shown photographs of the seized firearms.   Witness #1 acknowledged that he has seen and handled some of the pictured firearms.   According to Witness #1, he has seen and handled the guns when the guns were in possession of a close associate of Velez (Miguel Claudio); that he knew the .38 revolver belonged to Velez; that he had seen one of the long guns at Velez's stash location on Hamilton Street; and heard that all the guns were eventually given to Velez to settle a debt owed to Velez by one of Velez's associates.

Third, investigators seized multiple phones from CS-1.   On one of the seized phones, there were text messages that corresponded to dates when Velez is alleged to have delivered the narcotics and firearms to CS-1.   According to CS-1, Velez delivered the drugs first and then a few days later the guns.   More particularly, it appeared from the text messages that Velez and CS-1 met on December 20, 2017.   The phone number used to communicate with CS-1 was not known to investigators.   According to CS-1, this was the second meeting when Velez delivered the eight guns.   The text messages corroborate that there was a meeting.   Moreover, there was a text message to CS-1 directing CS-1 to "wipe them all" which according to CS-1 was Velez directing him to make sure there were no fingerprints or DNA on the guns.   In an effort to corroborate CS-1's information, investigators obtained call detail and cell tower records. Because

Velez communicated with CS-1 by text message, no cell towers were used to transmit the electronic communications.   Investigators obtained cell tower information for Velez's known cell phone.   According to the cell tower records for Velez's known cell phone, it was utilizing towers in Hartford's South End in the vicinity of the meeting location described by CS-1.

Fourth, CS-1 has pleaded guilty to his involvement in the possession of heroin, fentanyl, and a firearm, and knows that if he provides false testimony or information, his plea agreement with the government is null and void, and the Court could sentence him to a maximum of life imprisonment.

In April 2018, investigators interviewed another associate of Velez. This associate (hereafter Witness #2) has a close relationship with Velez and is aware of Velez's association with the Almighty Latin King Nation and his involvement with criminal activity. Witness #2 told investigators that when Velez was arrested and his stash location on Hamilton Street was searched, there was a kilogram of heroin that was not located by investigators during the search.   Witness #2 also reported that s/he is involved in a business venture with Velez and that their venture has lost significant amounts of Velez's money.   In March 2018, Velez told Witness #2 that when his associates lose small amounts of money Velez "smacks" them around to teach them a lesson.   The second time an associate loses money, or if the amount of money is significant, then "they're done."   Witness #2 interpreted Velez's statements as a death threat given the amount of money their venture lost.   In April 2018, Witness #2 received multiple text messages from Velez's known cell phone that expressed anger accusing Witness #2 of betraying him and causing Velez to lose money.   Witness #2 believes these text messages confirm that Velez wants to harm him.

Multiple sources interviewed by the FBI have reported that Velez told other Latin King

associates of the ongoing investigation and to be careful of what they say as the person with whom they are talking could be wearing a wire.

Velez denies the post-arrest criminal conduct, *see* Def. Mem., at 5, *et seq.*, and portions of the PSR sentencing guideline calculation.   Velez believes, therefore, he should receive a three level reduction for acceptance of responsibility.   *See infra.*   Velez concedes that under either Guideline calculation (the defendant, the government, or the PSR), the resulting sentencing range is 360 months to life.   *Id.*, at 5-6.   Should the Court determine that it must or should resolve those factual disputes, the government is prepared to present witness testimony.   The government has already informed counsel for the defendant that CS-1 has since died from a drug overdose. CS-1's sentencing was delayed pending the conclusion of the Velez sentencing.   With the onset of the COVID-19 pandemic, CS-1 was released from prison as he was at high risk to become seriously ill should he contact the virus.   Three days following his release, CS-1 died from a drug overdose.   Should a *Fatico* hearing be needed, the government would call the case agent and offer the grand jury transcript of CS-1.

III.   **GUIDELINE CALCULATION**

Velez pleaded guilty to Counts One and Three of the Indictment.   As to Count One, the government and defendant agreed that the base offense level was 30 based on the stipulated quantity of one kilogram of heroin and 700 grams of fentanyl.   The parties further agreed to the following enhancements:

- Two levels are added under U.S.S.G. § 2D1.1(b)(1) as a dangerous weapon was possessed;

- Two levels are added under U.S.S.G. § 2D1.1(b)(2) as the defendant used violence or made a credible threat to use violence;

- Four levels are added under U.S.S.G. § 3B1.1(a) as the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive; and

- Two levels are added under U.S.S.G. § 3B1.4 as the defendant used or attempted to use a person less than 18 years of age to commit the offense.

These enhancements increased the offense level to 40. The parties did not agree on the following possible adjustments.

- Two level enhancement under U.S.S.G. § 3C1.1 (obstruction of justice). The government contends that the defendant willfully obstructed or impeded the administration of justice, or attempted to obstruct or impede, the administration of justice;

- Three level reduction for acceptance of responsibility under U.S.S.G. §3E1.1(a). The government does not believe that the defendant is eligible for this reduction because, *inter alia*, he engaged in additional criminal conduct after his release on bond and willfully obstructed or impeded the administration of justice, or attempted to obstruct or impede, the administration of justice.

The PSR included a two level enhancement under U.S.S.G. § 2D1.1(b)(12) as the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance. *See* PSR ¶ 54. The facts support such an enhancement and the Court should include it. The government does request, however, that the Court vary or depart to give effect to the parties' plea agreement.

As to Count Three, the Government and the defendant agree that U.S.S.G. § 2A2.2 (Aggravated Assault) is the applicable Sentencing Guideline Section. The sentencing manual index directs violations of 18 U.S.C. § 924(o) to Section 2K2.1. Section 2K2.1(c) provides that if the defendant used or possessed the firearm in connection with the commission or attempted commission of another offense, apply Section 2X1.1 (Attempt, Solicitation, or Conspiracy). Section 2X1.1(a) provides the base offense level from the guideline of the substantive offense,

plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty.   In this case, the substantive offense is aggravated assault and therefore Section 2A2.2 applies.

Under U.S.S.G. §2A2.2, the base offense level is 14.   Five levels are added as a firearm was discharged under U.S.S.G. §2A2.2(b)(1) and five levels are added under U.S.S.G. §2A2.2(b)(3) as the victims sustained serious bodily injury, resulting in a total offense level 24. Should the defendant accept responsibility in accordance with U.S.S.G. § 3E1.1, as set forth above, three levels should be subtracted resulting in an adjusted offense level of 21.

Based on an initial assessment, the parties agreed that the defendant falls within Criminal History Category (CHC) VI.   A total offense level 21, assuming a Criminal History Category VI, would result in a sentencing range of 77 to 96 months of imprisonment, and a fine range of $20,000 to $200,000, U.S.S.G. § 5E1.2(c)(3).   The parties agreed that the counts should be grouped and therefore the count with the higher Guidelines range becomes the applicable range.   *See* PSR ¶ 50.

IV.   **IMPOSITION OF A REASONABLE SENTENCE UNDER 18 U.S.C. § 3553(a)**

A.   Legal Standard

Under 18 U.S.C. § 3553(a), the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."   The statute then provides:

> The court, in determining the particular sentence to be imposed, shall consider–
>
> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)    the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

B.   Sentencing Factors in 18 U.S.C. § 3553(a)(2)

1.   *Seriousness of the Offense, Respect for the Law, and Providing Just Punishment.*

**Velez's Role in the ALKN**

Velez's association with the Latin Kings dates almost 20 years to when he was a teenager. Over time, Velez sought to elevate his position within the Latin Kings, rising to a Regional Officer (RO) for the Connecticut Latin Kings.   In that position, Velez directed the criminal activities of the Latin Kings in Hartford, and elsewhere.   Intercepted wire communications revealed that Velez was in regular contact with some of the highest-ranking Latin Kings in the east coast of the United States and Velez.

For example, on August 26 2017, Velez was intercepted communicating with Esther Ortiz, a.k.a. "India," about the termination of a female member (identified in the intercepted calls as "JoJo") from the gang.

VELEZ: "Capone [Randy Cortes] gave her a direct order of Hartford to go back to Hartford meet up and, um, went back to Hartford JoJo go there and she like, she sweet. I guess they bounced her for the situation for her choosing her friend over one of Nation."

. . .

VELEZ: "That shit killed me like, that was my friend whenever I needed her she pick up. She ain't never tell me no.

ORTIZ: "Yeah but I mean can you bring her back?"

VELEZ: "(UI) Regardless of how I feel about her ... she got no respect for rules. She got no respect for right. It's just how she is. She thinks she's a n*****. (Pause) It broke my heart just to watch her get 'Tee'd.' All she had to do was go home, India. Then she came back again, she came back again and they whooped her again. Those sisters ain't want to hit her. Yo, they were begging her to leave."

. . .

VELEZ: "This shit hurt to tell my wife that JoJo ain't a sister no more (UI). But when I, when I (UI) what I used to only do for my wife that was my counselor yo. That was my counselor man."

In a later call, Velez explained the situation to another Latin King member. VELEZ: "So now we in the parking lot, I was like, yo, she oh I'm a sister. I took the (UI) I just snapped bro, I was like you ain't no fucking sister. You fucking report? You don't report, you ain't no fucking

sister. Oh but my man is a brother. I don't care, yo, your man don't report he ain't no fucking

brother. I just flipped you heard."

(Talk over each other)

VELEZ: "And no I was yelling and she, she's like, oh, who are you. Oh you want to know

who the fuck I am. I'm **King Wiso Regional Fucking Officer** and you ain't no fucking sister! She

shut up quick her eyes opened up. I don't got to tell you who I am and you know I'm trying to

keep peace. Why not help me keep the peace."

In a later conversation with Hector Vega, Velez told Vega, "No, n****, I Tee'd her. C

didn't tee her . . . I made, I made her decision for C that's wy I go between them and then I said

Tee her, and C like he ain't going to stop it."

VELEZ had higher aspirations than being a RO; he coveted the higher position of SRO, or

State Regional Officer.   On August 25, 2017, Velez was intercepted talking to another ALKN

member, Julio Echevarria, a.k.a. "Warrior," about Velez's possible ascension to SRO.   A portion

of this call is summarized as follows.

VELEZ: "You heard anything about Capone leaving the, um, there gonna be a new SRO?"

ECHEVARRIA (JE):  "Um. He spoke with you already right?"

VELEZ: "About? So you know about it?"

JE: "He spoke with me about something, bud."

VELEZ: "What he spoke to you about?"

JE: "The same thing that you, but he says that you trying to figure out."

VELEZ: "So it's really true?"

JE: "Something like that. Who told you that though?"

VELEZ: "Listen, listen, listen. I'm asking you to verify. So is it true that I'm gonna be the new SRO?"

JE: "My boy, I can't tell you what it is. No that's not gonna be true. That's that man's job to tell you that you heard?"

On August 27, 2017, Velez and Ortiz were intercepted talking about a large Latin King meeting.   Velez was complaining about having enough time, but told Ortiz, "[i]f I get notified in time, he yo, I'll be like in month in advance, I can gather up the state."

Velez valued the Latin Kings and its strict regulations above all else.   In one instance, on September 18, 2017, Velez wanted to "terminate" a fellow member, but knew he needed the concurrence of the SRO, Randy Cortes, a.k.a. "Capone."   In this call, Velez is talking to another Latin King, Hector Vega.

VELEZ: "No, no, first of all I can't expel a member you know what I'm saying? Capone got to say so. I'm letting you know I want to expel a member but after I talk to Capone."

VEGA: "You know he going to be like hell yeah."

VELEZ: "Yeah, but what I'm saying I just don't go around expelling members just cause I feel like it.   I talk to Capone first   . . . Yeah I'm gonna "T" that n***** myself, I don't even want New Britain to do it.   I'm gonna come with my squad and T him."

Velez also discussed the "termination" with Cortes on the same date.   In that call, Velez told Cortes, "I'm expelling this dude . . . Blaze from New Britain" because he "told him shit about, about the Nation everything."   Later in the call, Velez explained, "I told Demon that to get word to New Britain about, I told him, yo, for the sake of security of the just us, not just of the Chapter but of the heard of the security for the SRO, that's for the whole Nation."

24

Other examples of VELEZ proclaiming his role in the Latin Kings and its criminal enterprise include:

- "but you know I'm involved in drug activities out there that have to do with the NATION. I don't get involved in unless the NATION is."    VELEZ to Randy CORTES on 9/16/17.

- "If I make a decision out here in the nation that's what it is. N****s know I don't make decisions just because I'm feeling some type of way." Velez to Vega on 10/11/17.

**<u>Velez's Gang Violence</u>**

Velez's commitment to the Latin Kings and its criminal enterprise is enduring.   Despite spending the majority of his adult life in prison, Velez had no hesitation in resuming that life style. He not only returned to the gang life style, but embraced it.   When a small-time dealer was selling drugs in Latin King territory, Velez brought his crew of enforcers to move the dealer off the block. Knowing that violence was a likely outcome, Velez made sure one of the crew was armed with a firearm.   Drugs and guns is all that Velez knew, and wanted to know.   He knew the dangerous intersection of guns and violence, particularly involving street gangs.

Even within the Latin Kings, there was conflict and violence, and Velez was often at the center of it. Velez, for example, was involved in an ongoing dispute with another Latin King, Nelson Ferry, a.k.a. "300."   In June 2017, Ferry's brother, Jeffrey Ferry, was involved in a physical altercation on Broad Street in which several Latin Kings were present to include Velez. According to a confidential informant, Jeffrey Ferry was assaulted by a person with Velez's alleged consent.   Subsequently, on June 15, 2017, Hartford Police patrol units responded to 62 Madison Street based upon reports of an assault with a firearm involving two victims.   The two

victims were Latin King members, Kennth Herrera, a.k.a. "Murda," and Pedro Carrillo, a.k.a. "P" and "Flac."   Herrera was the fifth Latin King member with Velez on April 28, 2017 during the Franklin Avenue shooting, but was not charged.   Carrillo would later be arrested and convicted of committing a violent crime in aid of racketeering and brandishing a firearm in further of that violent crime.   According to the Hartford Police informant, a person associated with the Nelson Ferry's group shot Herreara and Carrillo in retaliation against Velez for the Broad Street incident.

On June 22, 2017, Nelson Ferry, who was serving a prison sentence for a violation of probation, called Marisol Ferry on a recorded prison line.   The intercepted communications reveled that Marisol Ferry received information that Velez put a "hit" on Nelson Ferry in retaliation for the Broad Street shooting.   Velez's feud with Ferry continued throughout the investigation. On September 4, 2017, Velez complained to Esther Ortiz about Ferry and his role in shooting Herrera and Carrillo and the danger he presents to the "Nation."

VELEZ: "That, that fat n**** reached out, out here he reached out to Capone."

ORTIZ: "Mmhmm."

VELEZ: "Trying to, um, plead his case."

ORTIZ:   "Oh yeah."

VELEZ: "Yeah that n**** got me feeling some type. I already told, I already told C bro, I catch that n**** he all set. I don't give a fuck what nobody say."

ORTIZ: "And what he said about it?"

VELEZ: "He ain't say nothing. Bro I said he's a security risk his brother put brother in a fucking wheel chair, shot another brother. So he ain't doing nothing about that shit, he just a security risk to everybody in this Nation, he gotta go. I don't give a fuck who he related to."

ORTIZ: "Oh yeah cause the other one is in the wheel chair right?"

VELEZ: "Yep."

VELEZ: "The security of the Nation come first and then, yo, too many people came up from where they saw paperwork on that n****, that's neutral. See what I'm saying."

Later in the investigation, Velez was convinced that the "Feds" were on to him, and Ferry was to blame.   For example, on October 4, 2017, Velez told another Latin King that, "I think 300 [Nelson Ferry] and his brother put the Feds on me." Later in the call:

VELEZ: "Thats why I'm being investigated. Word on the street. The word on the street is that I'm beefing with J Thirty [Jeffrey Ferry] and 300."

VELEZ: "It's crazy, I, I haven't even see 300 since he been home. So I know he's running his mouth."

VELEZ: "They some faggots though cause I'll fight any of them niggas anytime they want."

As noted above and in the PSR, when Cruz Fernandez got into a dispute with Joshua Amaral, Fernandez called Velez for his blessing in retaliating against Amaral.   Believing that Amaral may also be a "rat" Velez authorized Fernandez to use violence ("bang on him") against Amaral.

### Velez's Drug Operation

Velez supplied substantial quantities of dangerous drugs, including fentanyl, to other Latin King members who in turn distributed those drugs to other customers.   For example, Velez was the principal drug supplier to street level dealers on Elliot Street, to Sammy Diaz, a Latin King leader in Meriden, and numerous other dealers who received drugs at 8-10 Hamilton Street.   Even

27

his arrest in December 2017 did not stop him from selling dangerous drugs.   He used a juvenile, and 18-year old nephew, and his foster father, to facilitate his drug operation.   He later off-loaded numerous firearms and drugs to an associate because he was being supervised by federal probation and needed the money.   To ensure that the federal investigation went no further than his arrest, he tipped off other trusted Latin King members of the federal investigation.

   2.   *Adequate Deterrence and Protection of the Public*

Velez's criminal history matches what he learned from a life on the street ("all I knew was guns and drugs").   *See* PSR ¶ 46.   Beginning at age 16, Velez has accumulated a series of convictions involving drugs and guns.   *Id.* ¶ 66, et. seq.   In his sentencing memorandum, Velez notes that nine of his criminal history points relate to convictions committed while a teenager. *See* Def. Mem. 7.   If that were the only convictions on his criminal history, Velez may have a credible argument for mitigation.   But Velez's record reflects a dramatic escalation in the breadth of his criminal involvement.   After completing several overlapping sentences from those convictions, Velez as on parole in 2006 when he was arrested again for firearm and narcotics offenses.   *See* PSR ¶ 71.   He returned to prison to serve a 12-year sentence, suspended after seven years, followed by four years' probation.   *Id.*   He then served 74 months of continuous incarceration.   *Id.* ¶ 73.   While incarcerated, he accumulated 22 disciplinary infractions, many of which for serious violations.   *Id.*

Still, Velez resumed criminal activity and gang associations, with his current offense conduct the most serious, violent, and dangerous.   There is unquestionably a need to protect the public from Velez's repeated and dangerous criminal conduct.   He employed violence.   He solicited others to commit violence.   He authorized the use of violence by others.   He authorized

28

or participated in gang terminations.   He recruited teenagers to become part of the very "family" he now claims to denounce.   And he brought drug dealing and gang members to the only family he should care about.

Specific deterrence is also an important consideration here.   Despite a the previous 74-month prison sentence, Velez escalated his role in the Latin Kings and expanded his criminal conduct.   Velez was no longer a misguided teenager searching for a family, he was now the patriarch of two families, the most important of which to him was the Latin Kings.

### 3.   *Educational and Vocational Training, and Medical Care and Treatment*

Velez sustained multiple gunshot injuries in 2015, which caused other health related issues, as set forth in the PSR ¶ 94.   Velez has a history of substance use and abuse, but claimed only to be using marijuana and alcohol.   *Id.* ¶ 96.   Despite his long history of substance abuse, Velez never sought or received substance abuse treatment.   *Id.*

Velez obtained his GED in 2006, and completed a commercial cleaning training program while incarcerated at DOC.   *Id.* ¶ 99.   As previously discussed, Velez reported that he owned and operated a clothing store with his wife, but he also owned and operated a construction business. *Id.* ¶ 100.   Velez's employment history is otherwise sporadic, and limited, despite being on probation beginning in 2012.   *Id.* ¶¶ 101-102.

Velez has started up and operated at least two businesses, which demonstrates some level of motivation and skills.   As described in the introduction, Velez was positioned to succeed without the Latin Kings and the gangster lifestyle.   Velez's decision to further his allegiance and expand his role with the Latin Kings was his conscious choice.   Velez is about to be sentenced he wanted both families even though he knew his crime family would eventually cause the destruction

of his second.   This reality was not the product of only one decision.   Velez made that decision to choose his first family every day.   Velez's risk for recidivism is therefore very high and his return to criminal activity a virtually inevitability.

Velez points to his comparatively poor health and the increased risk to becoming seriously ill should he contract COVID-19.   *See* Def. Mem. at 18 *et seq*.   Velez has been incarcerated since April 2018.   Velez's health, as is the health of any another defendant, is an important factor to consider, but it is only one factor.   While the COVID-19 pandemic has challenged every aspect of our society, including the prison inmate population, the BOP continues to manage aggressively against the spread of the virus.   While many facilities have been significantly inflicted with the disease, many have not.   Incoming inmates are quarantined upon arrival, and prisoner movement has been slowed to prevent the disease from spreading.   As of June 22, 2020, about 1 % of the BOP population are currently positive for COVID-19.   *See* https://www.bop.gov/coronavirus/.

Velez attempts to use the sentences imposed for Miguel Claudio and Joshua Armaral as benchmarks for the "fairness" of Velez's potential sentence.   *See* Def. Mem. at 31.   They are not comparable.

- Velez was the second highest-ranking Latin King in Connecticut.

- Claudio and Amaral reported to Velez and acted at Velez's direction.

- The April 28, 2017 shooting was the result of Velez's actions, and without Velez it never happens.

- Velez was involved in and the leader of sustained drug trafficking activity throughout the conspiracy, resulting in a much larger drug quantity.

- Claudio was in a coma for four months and arrested shortly after his release from the hospital, and while Claudio immediately resumed his criminal relationship with Velez, Claudio's arrest prevented further evidence of a continued relationship.

30

- Amaral was arrested earlier in the investigation after Velez authorized Cruz Fernandez to shoot him.

- Velez employed teenagers, including a juvenile, to protect his drug trafficking enterprise.

- Velez obstructed justice by alerting other potential targets of the investigator of the federal investigation and use of body recordings.

- Velez continued his criminal activity after his federal arrest.

Velez also seeks to compare his potential sentence with that imposed by Judge Dooley for Pedro Carillo, and his role in the violent assault during a Latin King termination.   Carillo, for a short time after Velez's arrest, filled the role of Inca of the Hartford Latin Kings.   The Inca would typically report to the RO.   Carillo, as Inca, authorized the violent termination of the victim, and participated in the assault.

Their conduct shares some similarities, but are easily distinguishable.   Carillo was not charged with being a leader of a prolific drug trafficking organization, as Velez was.   Carillo was CHC IV.   Velez is CHC VI.   Carillo was 23 at the time of the offense.   Velez was 32.   Velez also authorized and validated gang terminations.   Velez also authorized violence to be used against others in the gang.   Velez's actions resulted in the shooting of two men, and Claudio, and given the brazen and reckless nature of the shootings, Velez could have easily been facing felony murder and racketeering charges.   Carillo's plea agreement was also the product of a complicated negotiation that was intended, in part, to save the victim from testifying in open court against a violent, vengeful street gang.

V.   **SUMMARY AND CONCLUSION**

The sentencing guidelines recommend a sentence of 360 months to life, even if the Court

31

found that Velez did not obstruct justice and awarded him a three-level reduction for acceptance of responsibility.   That range is the starting point for the Court's process in the consideration of the various sentencing factors.   Velez advocates for a sentence of 148 months' imprisonment. Twelve plus years in prison is neither sufficient nor adequate to reflect the seriousness of Velez's criminal conduct, to promote respect for the law, to protect the community from his repeated dangerous criminal conduct, or to deter him.

Congress has mandated a prison term of 10 years based solely on the drug quantity involved.   Even if all that Velez did was to distribute a certain quantity of narcotics, a ten-year sentence *may have* been *minimally* necessary to achieve the purposes of a criminal sentence, particularly given his lengthy criminal past.   But Velez's conduct was exponentially more involved and serious than just selling dangerous drugs.   He was the leader of notoriously violent street gang.   He used and exploited teenagers to advance his drug trafficking operation.   He approved, authorized, and directed violence in the name of the Latin Kings.   He brought his criminal activity to his own doorstep endangering his own children.   He did all this not to support his family, but because he relished being the head of his first family – the Latin King Nation.   And when given an opportunity to show redemption and remorse on pretrial release, he chose to thwart the FBI's investigation and resume criminal activity.

Accordingly, for all these reasons, the government submits that a sentence of **240** months' imprisonment, is reasonable, appropriate and minimally necessary to achieve the purposes of a criminal sentence.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/ *Brian P. Leaming*
BRIAN P. LEAMING
ASSISTANT UNITED STATES ATTORNEY
450 Main Street, Room 328
Hartford CT 06103
(860) 947-1101
Federal Bar No. CT 16075

## CERTIFICATE OF SERVICE

This is to certify that on June 25, 2020, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

 */s/ Brian P. Leaming*
BRIAN P. LEAMING
ASSISTANT UNITED STATES ATTORNEY